THE STATE OF WASHINGTON, *on the Relation of John J. O'Connell, as Attorney General, Plaintiff,* v. VICTOR A. MEYERS, *as Secretary of State, Respondent.*[1]

[1]Reported in 319 P. (2d) 828.

456

*The Attorney General* and *George N. Prince, Special Assistant,* for relator.

*Marshall A. Neill* and *Lyle L. Iversen, Special Assistant Attorneys General,* for respondent.

*Macbride, Matthews & Hanify,* for interveners Washington State Grange and Nelson.

*Brodie & Fristoe,* for interveners Washington State Farm Bureau Federation and Gillespie.

OTT, J.—This is an original proceeding in this court, in which the relator seeks a writ of mandamus compelling the secretary of state to perform his duties, with reference to redistricting the state, in accordance with Laws of 1957, chapter 5, p. 11 (initiative No. 199), rather than Laws of 1957, chapter 289, p. 1147, contending that the latter enactment is unconstitutional and void.

The record contains no statement of facts; nevertheless, we take judicial notice of the following:

(1) Initiative No. 199 was approved by the voters of this state at the November 6, 1956, general election. December 6, 1956, the governor proclaimed the measure to be law. It was enrolled as chapter 5, Laws of 1957. (It will be hereinafter referred to as initiative 199.)

(2) The state legislature, at its 1957 regular session, passed chapter 289 by a vote of more than a two-thirds majority of the members in each house. It became law, without the governor's signature, at midnight June 12, 1957.

Several contentions regarding the scope of this proceeding were made by relator, respondent, and interveners in their briefs and in argument before the court. In order that the scope of this action be clear, we define the issues as follows:

(1) In this proceeding, we are concerned solely with the constitutionality of the legislature's amendment to initiative 199. Both initiative 199 and chapter 289 were designed to comply with that portion of Art. II, § 3, of our constitution, which provides that the legislature periodically " . . . shall apportion and district anew the members of the senate and house of representatives, according to the number of inhabitants, . . . " We are not here concerned with what the legislature did or failed to do since 1895, or with what the people, through their right of initiative, did or failed to do since 1912, concerning the matter of redistricting.

(2) The parties agree that, both by virtue of the constitution and by the basic concept of our representative form of state government, it is required that legislative districts be established according to the number of inhabitants. Likewise, it is conceded that the districts must be reasonably proportionate according to the number of inhabitants, in order to stand the test of the constitutional mandate.

(3) The constitutionality of initiative 199, without the legislative amendments, is not before us. A law initiated and adopted by the people, as well as a law enacted by the legislature, is presumed to be constitutional. See *Frach v. Schoettler,* 46 Wn. (2d) 281, 280 P. (2d) 1038 (1955); *Gruen v. State Tax Commission,* 35 Wn. (2d) 1, 211 P. (2d) 651 (1949); *State v. Brunn,* 22 Wn. (2d) 120, 154 P. (2d) 826 (1945). Therefore, for the purposes of our considerations in this proceeding, initiative 199 is a constitutional act.

Whether a more equitable formula of representation would have been effected by the method provided by initiative 199 or by chapter 289 is not an issue because (1) there are no facts or evidence in the record with which a comparison can be made, and (2), in the absence of such evidence, we must assume that either of the methods accomplished the purposes of the constitutional mandate.

With the scope of this mandamus proceeding defined, we consider the issues as joined by the pleadings.

Respondent contends that this court does not have jurisdiction of this proceeding, for the reason that the pleadings do not present a justiciable issue.

The governor, in permitting chapter 289 to become law without his signature, recognized that its enactment presented a legal issue that could be determined only by the court. The governor's message to the legislature is, in part, as follows:

" 'There exists in my mind a serious question as to whether or not Substitute Senate Bill No. 374 [chapter 289] merely amends Initiative 199 or whether it in effect repeals the Initiative. This represents a legal issue which under the Constitution can only be decided by the Supreme Court of this state.' " Laws of 1957, p. 1162.

Art. IV, § 4, of the state constitution, provides, in part:

"The supreme court shall have *original jurisdiction* in habeas corpus, and quo warranto and *mandamus as to all state officers*, . . ." (Italics ours.)

■ The primary factor to be considered, in determining whether this court should assume or refuse original jurisdiction in mandamus to a state official, is whether the sovereignty of the state, its franchises, prerogatives, or the rights and interests of the general public are involved.

In *State ex rel. Malmo v. Case,* 25 Wn. (2d) 118, 123, 169 P. (2d) 623, 165 A. L. R. 1426 (1946), this court adopted the following rule with reference to mandamus proceedings:

"And in this connection the established rule seems to be that as original jurisdiction is conferred in order that the court of highest authority in the state should have the power to protect the rights, interests, and franchises of the

state, and the rights and interests of the whole people, to enforce the performance of high official duties affecting the public at large, . . . the court is vested with a sound legal discretion to determine for itself, as the question may arise, whether or not the case presented is of such a character as to call for the exercise of its original jurisdiction." 18 R. C. L. 101, § 15 (restated in 34 Am. Jur. 824, § 26).

By statute, the secretary of state is designated the chief election officer for all state, city, and town elections. RCW 29.04.070 [cf. Rem. Supp. 1949, § 5147-2]. He is charged with the duty of publishing the election laws in force and distributing them to county auditors " . . . in sufficient number to place a copy thereof in the hands of all officers of elections." RCW 29.04.060 [cf. Rem. Rev. Stat. §§ 5193, 5299]. Further,

"The secretary of state shall make rules and regulations not inconsistent with the state, city and town election laws to facilitate the execution of their provisions in an orderly manner and to that end shall assist local election officers by devising uniform forms and procedures." RCW 29.04.080 [cf. Rem. Supp. 1949, § 5147-3].

These statutory duties must be performed prior to elections. Statutory changes made in the geographic boundaries of legislative districts are of paramount public importance to the state at large, and involve substantial public rights. Definitive information regarding such changes in geographic boundaries is essential to legislative candidates, as well as to officials of political parties if they are to perform their functions properly.

Under the constitution and the rule announced in the *Malmo* case, *supra,* we find no merit in respondent's contention that this court lacks jurisdiction to resolve the questions posed in this proceeding. See, also, annotation, 165 A. L. R. 1431.

Relator contends that chapter 289 repeals initiative 199, in violation of amendment 26 of the state constitution.

In the original text of the state constitution, exclusive lawmaking power was vested in the legislature. In 1912, the constitution was amended to provide for lawmaking power

in the people by initiative and referendum. This amendment provided, in part:

"No act, law, or bill approved by a majority of the electors voting thereon *shall be amended or repealed by the legislature within a period of two years following such enactment.* But such enactment may be amended or repealed at any general regular or special election by direct vote of the people thereon." (Italics ours.) Amendment 7, state constitution.

In 1952, the people, by constitutional amendment 26, removed this two-year limitation as follows:

"No act, law, or bill approved by a majority of the electors voting thereon shall be amended or repealed by the legislature within a period of two years following such enactment: *Provided, That any such act, law or bill may be amended within two years after such enactment at any regular or special session of the legislature by a vote of two-thirds of all the members elected to each house* with full compliance with section 12, Article III, of the Washington Constitution, and no amendatory law adopted in accordance with this provision shall be subject to referendum. . . ." (Italics ours.)

■ The constitution, as amended, must be construed to carry out the intent of the people. *State ex rel. Billington v. Sinclair,* 28 Wn. (2d) 575, 183 P. (2d) 813 (1947). The intent must be determined from the express words in the amendment and the purposes for which it was adopted. *State ex rel. Billington v. Sinclair, supra; State ex rel. Linn v. Superior Court,* 20 Wn. (2d) 138, 146 P. (2d) 543 (1944).

■ It is clear that the people, by adopting amendment 26, intended to relinquish the two-year immunity from any action by the legislature, which previously existed under the 1912 constitutional amendment. It is likewise clear that the people recognized the propriety of removing the inflexibility which existed under the 1912 amendment, by permitting the legislature to amend any initiative measure adopted by the people. We must, therefore, conclude that the people determined that their rights were adequately protected by the requirement that an amendment of an initiative could be effected only by a two-thirds vote of all

of the members duly elected to each house. This conclusion is strengthened by the fact that the people, in adopting amendment 26, further provided that the legislative amendment of an initiative would not be subject to referendum.

Does chapter 289, Laws of 1957, amend initiative 199?

In the title to chapter 289, the legislature used the words, ". . . amending section 4, . . . and 58, chapter 5, Laws of 1957; . . ." From the title of the act, it would appear that the legislature intended only to amend. The body of the act establishes that the legislature intended the law to be amendatory only of specific, named sections of the initiative. Sections 1, 2, 3, 14, 20, 22, 24, 52, 54, and 55 of the initiative were not in any manner amended or altered by chapter 289.

■ It is a general rule of statutory construction that, if any section or sections of the original act remain, the new matter or changes are amendatory only of the original act. *United States ex rel. Palmer v. Lapp*, 244 Fed. 377, 383 (1917); 1 Sutherland, Statutory Construction (3d ed.), 325, § 1901.

■ The form of the act and the amendatory words used therein indicate that the legislature intended to amend initiative 199.

Relator contends that, although the legislature designated the act as amendatory, the result was in fact a repeal, and, specifically, that the repeal of § 56 of initiative 199, which provided a method of redistricting by census tracts, and substituting therefor a redistricting based upon precinct boundaries, constituted such a radical change as to effect a repeal.

■ When the people granted to the legislature amendatory power, they did not define the word, "amend." It must therefore be given its usual and ordinary meaning. *Pacific Northwest Alloys v. State*, 49 Wn. (2d) 702, 705, 306 P. (2d) 197 (1957).

■ In Webster's New International Dictionary (2d ed.), the word "amend" (when used in a parliamentary sense) is defined as follows:

" . . . to alter (as a bill or resolution) formally by some addition, taking away, or modification; as, to *amend* an appropriation bill. The changes that may be made in amending a bill or resolution are practically limited only to those that do not bring in a subject different from the original."

Cushing, Law and Practice of Legislative Assemblies, 517, § 1302, states:

"A proposition may be amended, in parliamentary phraseology, not only by an alteration which carries out and effects the purpose of the mover, but also by one which entirely destroys that purpose, or which even makes the proposition express a sense the very reverse of that intended by the mover."

In *Wade v. Tacoma,* 4 Wash. 85, 29 Pac. 983 (1892), in construing the scope of an amendment, we said: "The amendment may effectually supplant or destroy the original charter and institute a new policy altogether."

In *State ex rel. Hindley v. Superior Court,* 70 Wash. 352, 126 Pac. 920 (1912), the city charter provided that five commissioners be elected by the whole body of the electors. Proposed amendments provided that ten councilmen be elected, and that their election should be by wards. The contention was that the constitutional provision which authorized city charter amendments would not permit such radical changes, under the guise of amendment. This court, in sustaining the change as an amendment, said [p. 359]:

"It is also said that amendments referred to and provided for in the charter are only such revisory or supplemental changes as the working of the present charter may suggest, and should not be held to refer to amendments which alter or annul the basic plan or principle upon which the city government is founded. It would be dangerous indeed for courts to draw a line between amendments, or to classify them in any way; for the whole question is a political one, to be determined by the people themselves. This they may do and should have the fullest right to do, without suggestion or interference by the courts."

The interpretation of the meaning of the word "amend" by this court is consistent with that of other jurisdictions. In *Cantini v. Tillman,* 54 Fed. 969, 975 (1893), the court said:

"It is a settled principle of parliamentary law in this state [South Carolina] that, so long as the enacting words remain in a bill, it can be amended to any extent, even by striking out all after the enacting words, and by inserting other words as a substitute. . . . Nothing is more common than to amend by striking out one section and by inserting another, or by striking out several sections and by inserting one or several; and if it be competent to amend by striking out and inserting one, two, three, four sections, clearly it is competent to strike out all the sections, and to insert others, *in pari materia*. Striking out all after the enacting words, and inserting, is nothing but an amendment, and is governed by the same rules as other amendments."

Accord, *Brake v. Callison*, 122 Fed. 722 (1903).

■ Giving the word "amend" its usual and ordinary meaning as set out in Webster's Dictionary, and its meaning as given by this court and other jurisdictions, we must hold that the people, by granting to the legislature the right to amend, authorized it to change the law completely, within the realm of the subject matter contained in the act.

■ Since chapter 289 deals with the same subject matter as that contained in initiative 199, namely, redistricting, the legislature had the unlimited power to establish methods of redistricting, and to alter, modify, take away, add to, or change the various districts in such manner as it saw fit. It follows, then, that the repeal of § 56 of initiative 199, which established a method of redistricting, and substituting therefor another method, constituted an amendment of the act well within the purview of the definition of that term.

Relator next contends that chapter 289, Laws of 1957, is unconstitutional, being violative of Art. II, § 3, which provides:

"The legislature shall provide by law for an enumeration of the inhabitants of the state in the year one thousand eight hundred and ninety-five and every ten years thereafter; and at the first session after such enumeration, and also after each enumeration made by the authority of the United States, the legislature shall apportion and district

anew the members of the senate and house of representatives, according to the number of inhabitants, . . . "

This contention is based upon two premises, (1) that the legislature is powerless to redistrict at any time other than that specifically provided by Art. II, § 3, and (2) that chapter 289 violates Art. II, § 3, by establishing districts which contain unequal and disproportionate numbers of inhabitants.

With reference to the first premise, it is a familiar rule that the state constitution is a limitation upon, rather than a grant of, legislative power; that the legislature may enact any law not expressly or inferentially prohibited by the constitution of the state, and that, in so far as the power of the legislature is not limited by the constitution, it is unrestrained. *In re Bartz,* 47 Wn. (2d) 161, 163, 287 P. (2d) 119 (1955); *Union High School Dist. No. 1 v. Taxpayers of Union High School Dist. No. 1,* 26 Wn. (2d) 1, 6, 172 P. (2d) 591 (1946); *State ex rel. Pischue v. Olson,* 173 Wash. 60, 63, 21 P. (2d) 516 (1933). In the absence of specific words of limitation, an express enumeration of legislative powers does not exclude the exercise of others not named. *State ex rel. Robinson v. Fluent,* 30 Wn. (2d) 194, 203, 191 P. (2d) 241 (1948).

In *State v. Miller,* 32 Wn. (2d) 149, 154, 201 P. (2d) 136 (1948), we said:

"Affirmative statutory provisions relating to the time or the manner of performing official acts, unlimited or unqualified by negative words, are generally considered directory rather than mandatory."

It follows that, since Art. II, § 3, contains no negative or restrictive words of limitation, the legislature is not precluded from redistricting as often as it determines necessary.

The second premise poses a factual question. Relator concedes that there are no facts in the record from which this court can determine the number of inhabitants in any of the districts at the time the 1957 legislature redistricted the state. Relator's contention is that this court can take

judicial notice of the Federal census of 1950; that, according to this census, the number of inhabitants in the various districts created by chapter 289 is unequal and disproportionate, and that, hence, the act is void.

We are here concerned with the number of inhabitants within any given district at the time chapter 289 was enacted. In order for the court to take judicial notice of the population within a district at a specific time, the number of inhabitants must be so generally known and so notorious that the production of evidence to establish the number would be unnecessary. *Gottstein v. Lister*, 88 Wash. 462, 153 Pac. 595 (1915). To this general rule, we have added an alternate rule, that the court may take judicial notice of a fact or proposition when it is capable of ascertainment by resorting to accurate, indisputable records which are easily accessible.

In *McFerran v. Heroux*, 44 Wn. (2d) 631, 644, 269 P. (2d) 815 (1954), we adopted the rule as stated in Model Code of Evidence, p. 320, Rule 802, that judicial notice may be taken of

". . . (c) specific facts and propositions of generalized knowledge which are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy, . . ."

We have held that this court will take judicial notice of population as established by a Federal census. *Martin v. Tollefson*, 24 Wn. (2d) 211, 219, 163 P. (2d) 594 (1945); *State ex rel. Cornell v. Smith*, 155 Wash. 422, 284 Pac. 796 (1930). However, judicial notice of the 1950 census, in the absence of any proof that the population has remained static, is not notice that the same population existed when chapter 289 was enacted. In order for the court to take judicial notice of the population at that time, there must be accurate, indisputable, and easily accessible records establishing the population of those areas, to which this court can resort. We know of no such records. Neither can it be said that the number of inhabitants in the forty-nine dis-

tricts created was then of such general knowledge that proof thereof would be unnecessary.

For the reasons stated, we find no merit in relator's contention that this court can take judicial notice of the number of inhabitants in the several districts at the time of enactment of chapter 289.

■ The relator, in attacking the constitutionality of chapter 289 as being violative of Art. II, § 3, of the constitution, had the burden of proof to establish (1) the number of inhabitants in each legislative district in March, 1957, and (2) that disproportionateness exists among the various districts. See *Frach v. Schoettler*, 46 Wn. (2d) 281, 280 P. (2d) 1038 (1955). The relator failed to prove either of these essential elements.

■ There is a presumption that the legislature performed its duty by establishing the districts according to law. *Frach v. Schoettler, supra,* p. 285. The authority and duty to ascertain facts which control legislative action are upon those to whom was given the power to legislate. Courts will not inquire into a legislative factual determination, beyond consideration of that which appears *upon the face of the act,* aided by judicial notice. *State ex rel. Hamilton v. Martin,* 173 Wash. 249, 257, 23 P. (2d) 1 (1933). See, also, *In re Bailey's Estate,* 178 Wash. 173, 177, 34 P. (2d) 448 (1934); *Ajax v. Gregory,* 177 Wash. 465, 476, 32 P. (2d) 560 (1934).

Applying these long-established rules of constitutional and statutory construction to the instant proceeding, we find nothing on the face of the questioned act which establishes an improper legislative factual determination. Nor can this court, for the reasons heretofore expressed, take judicial notice of the matter *in pais* which relator urges would support his contention that the legislature arrived at an erroneous factual determination.

■ The voting precinct is intended to be of a transitory nature. RCW 29.04.040 [*cf.* Rem. Rev. Stat., §§ 5171, 5278]. By reason of its small numerical size, it is easily adaptable to being shifted from one legistative district to

another as fluctuating population requires. Likewise, it is necessary that legislative districts be transitory and flexible.

To the contrary is the purpose expressed by the Federal census bureau in establishing census tracts, namely, that such tracts "will remain as relatively permanent statistical areas." Census of Population, 1950, vol. 2.

The legislature, in the exercise of its sound discretion, determined that the precinct method was more suitable for a legislative redistricting program.

We find no merit in any of relator's contentions that chapter 289, Laws of 1957, is unconstitutional.

For the reasons stated, the petition for a writ of mandamus is denied.

MALLERY, ROSELLINI, and HUNTER, JJ., concur.

FINLEY, J. (concurring in the result)—Equality in legislative representation in proportion to population in so far as reasonably and practicably possible is a basic tenet of our democratic form of government. This is the reason for the inclusion of § 3 of Art. II in our state constitution. It is a mandate to the legislature (1) to provide for the taking of a state census in 1895 and every ten years thereafter, and (2) to apportion and district anew the members of the senate and house of representatives according to the number of inhabitants, excluding Indians not taxed, soldiers and sailors, and officers of the United States army and navy in active service, (a) after each state census, and (b) after each Federal census. Because the state census specified in Art. II, § 3, and the Federal census do not occur in the same year, but five years apart, Art. II, § 3, actually, under the circumstances, requires redistricting and reapportionment at least every five years.

The dissenting opinion by Judge Weaver blames no one in particular, but it points out the significant fact that successive legislatures for fifty-six years consistently have failed to comply with the provisions of Art. II, § 3, of the state constitution. This court has no power by mandamus

or otherwise to directly compel the legislature to comply with the provisions of Art. II, § 3.

Initiative No. 199 is an attempt on the part of the *electorate,* by the method of direct legislation, to redistrict and reapportion "according to the number of inhabitants." Apparently, this action by the electorate promptly inspired chapter 289, Laws of 1957, p. 1147, which is the first substantial legislative attempt in many years to comply with the mandate of the constitution.

At one point in the instant proceedings, it was understood that this matter was to be submitted upon a full and complete, agreed statement of facts. For some reason this was not done. As a consequence, there are no facts before this court and no facts of which we can take judicial notice which would enable us to conclude whether one or the other of the two attempts to redistrict "according to the number of inhabitants" actually succeeds in complying with that constitutional mandate of Art. II, § 3. The matter is further complicated by the fact that it has been seven years since an accurate, periodic Federal census was taken, and it is estimated that the population of our state has been increasing at the rate of three thousand inhabitants per month. For these reasons I believe it is impossible, because of the manner in which this case is presented to us, for this court to determine whether one or both of the recent attempts at redistricting and reapportionment are unconstitutional.

As pointed out by the majority, there is a presumption of constitutionality. Any constitutional attack upon either chapter 289 or initiative No. 199 on the ground that there has been no compliance with Art. II, § 3, has not been sustained. On this basis and because I agree with the majority that chapter 289 is a valid *amendment* of initiative No. 199, I concur in the result reached by the majority—that the writ of mandate should not issue.

WEAVER, J. (dissenting)—The thesis of this dissent is based on three tenets:

*First:* Laws of 1957, chapter 5, p. 11 (hereafter referred to as initiative No. 199), is constitutional; (section D, *infra*)

*Second:* Laws of 1957, chapter 289, p. 1147, is an unconstitutional repeal of initiative No. 199; (section E, *infra*)

*Third:* Laws of 1957, chapter 289, is unconstitutional regardless of any relation it may have to initiative No. 199. (section F, *infra*).

## A. ULTIMATE QUESTION

The ultimate question is whether senatorial and representative districts established by initiative No. 199, or senatorial and representative districts established by Laws of 1957, chapter 289, shall control "at the general election to be held in 1958, and every four years thereafter, . . ." (First sentence of § 1 of both laws.)

## B. BACKGROUND OF THE PROBLEM

The problem of securing and preserving equality of representation in legislative bodies has plagued representative government from an early time. For example, in England, many cities that were established during the industrial revolution found themselves with representation in Parliament woefully disproportionate to their population. On the other hand, rural regions found themselves with the same number of representatives in Parliament as they had before the growth of the cities. Those regions retaining representation out of all proportion to their population were frequently referred to as "rotten boroughs." Popular dissatisfaction grew as disproportionate representation increased. A national crisis forced passage of the reform act of 1832, which redistributed seats in Parliament; thus, the pressure that had accumulated for a century was eased. A. L. Cross, A Shorter History of England and Greater Britain, chapter L.

The same problem came to our shores at an early date. It was first crystalized in the Declaration of Independence.

"He has refused to pass other laws for the accommodation of large districts of people, unless those people would relinquish the right of representation in the legislature,—a right

inestimable to them, and formidable to tyrants only." Rem. Rev. Stat., Vol. I, p. 180.

Thus, the concept of equality of representation in legislative bodies became basic in the American ideal of representative government. A classic description of the importance of this principle is found in the opinion of Judge Willis of the court of appeals of Kentucky. Speaking for the court, he said:

"Equality of representation in the legislative bodies of the state is a right preservative of all other rights. The source of the laws that govern the daily lives of the people, the control of the public purse from which the money of the taxpayer is distributed, and the power to make and measure the levy of taxes, are so essential, all-inclusive, and vital that the consent of the governed ought to be obtained through representatives chosen at equal, free and fair elections. If the principle of equality is denied, the spirit, purpose, and the very terms of the Constitution are emasculated. *The failure to give a county or a district equal representation is not merely a matter of partisan strategy. It rises above any question of party, and reaches the very vitals of democracy itself.*" *Stiglitz v. Schardien,* 239 Ky. 799, 811, 40 S. W. (2d) 315 (1931). (Italics mine.)

When Washington was admitted to the Union on November 11, 1889, as the forty-second state, and our constitution became operative, thirty-five states had constitutional provisions which required or empowered their state legislatures, at the session following the Federal census, to reapportion the districts from which their members were elected. The drafters of those constitutions felt it important, with few exceptions, to require the legislatures to take action at least every ten years. Such a requirement was to cause public opinion in general, and areas entitled to more representation in particular, to re-examine the distribution of membership in the state's major policy-determining body. Four states, later admitted to the Union, adopted similar constitutional provisions.

With this background, it is not unusual that our constitution provides:

"THE CENSUS. The legislature shall provide by law for

an enumeration of the inhabitants of the state in the year one thousand eight hundred and ninety-five and every ten years thereafter; and at the first session after such enumeration and also after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and house of representatives, according to the number of inhabitants, excluding Indians not taxed, soldiers, sailors and officers of the United States army and navy in active service." Washington constitution—Art. II, § 3.

## C. Apportionment and Districting in Washington

The legislative history of reapportionment and redistricting in Washington is short, as it is in most states, because the constitutional provisions, to which I have referred, have been more honored in their breach than in their observance.

The first state legislature (1889-90) adjourned without accomplishing the constitutional task of districting and apportionment assigned it. This was done at a special session of the legislature September 3 through 11, 1890. Laws of 1890, special session, p. 1 (1 Hill's Code, § 37 *et seq.*)

In 1901, the legislature reapportioned and redistricted "anew the members of the senate and house of representatives." Laws of 1901, chapter 60, p. 79. (The act was passed over the governor's veto.)

For fifty-six years—from 1901 until 1957 when the legislature passed Laws of 1957, chapter 289, which is involved in the present problem—our successive legislatures ignored the provisions of Art. II, § 3, of the state constitution, quoted *supra*. It is true that throughout the years many mechanical and boundary changes of particular districts have been made by legislative acts, but none of them acquired the dignity of apportionment "anew . . . according to the number of inhabitants" as described in the constitution.

The reasons for this legislative lethargy are neither simple nor clear cut. They are a fusion of conflicting political, social, economic, and geographic considerations sprinkled with partisan interests and the influences of special groupings of population. To a great extent, these various forces have canceled each other.

Lest this be interpreted as a criticism of our past legislatures, I hasten to point out that the experience of this state parallels the experience of most states. In varying degrees, they have all been affected by this system of "silent gerrymandering." See Todd: "The Apportionment Problem Faced by the States." 17 Law and Contemporary Problems 314 *et seq.* (1952).

In 1930, the people, by initiative No. 57, redistricted the state and reapportioned seats in the legislature. Laws of 1931, chapter 2, p. 31. (See, Webster: "Voters Take the Law in Hand," 35 National Municipal Review 240 (1946).) It required a writ of mandate of this court to compel the secretary of state to file the initiative petition. *State ex rel. Miller v. Hinkle,* 156 Wash. 289, 286 Pac. 839 (1930). The constitutionality of the initiative was upheld in *State ex rel. Christensen v. Hinkle,* 169 Wash. 1, 13 P. (2d) 42 (1932).

In the legislation to which I have alluded, a combination of various geographic units has been used to define the boundaries and areas of senatorial and representative districts. These units consist, in the main, of (a) counties or a combination of two or more contiguous counties, (b) *voting precincts,* (c) towns, (d) townships, and (e) areas described in terms of Federal land surveys. (See Laws of 1933, chapter 74, p. 358.)

In Washington, *the voting precinct is of a transitory nature.* If, at any election, more than three hundred voters cast ballots, the proper authorities "shall divide such precincts into two or more precincts with two hundred fifty voters or less in each precinct." RCW 29.04.040. This is to equalize the work of precinct election boards. The boundaries of such precincts are established either by the city council, the board of county commissioners, or the board of supervisors of a township—for voting purposes. RCW 29.01.120. In addition, if ten or more voters reside more than ten miles from the polling place, upon petition, "the board of county commissioners shall establish a separate voting precinct therefor." RCW 29.04.040.

It was proper for previous legislation to use the voting

or election precinct as a unit of population in grouping legislative districts, because all Federal censuses, prior to the census of 1950, enumerated the inhabitants upon that basis.

*Volume I, Sixteenth Census of the United States, 1940, Population, Number of Inhabitants,* is an official publication of the United States department of commerce, bureau of census. The contents of this volume may be judicially noticed by us. (*Martin v. Tollefson,* 24 Wn. (2d) 211, 219, 163 P. (2d) 594 (1945).)

On page 1123 appears the following:

"Minor civil divisions.—To the primary political divisions into which the counties are subdivided the Census Bureau applies the general term 'minor civil divisions.' The primary divisions of the counties in Washington are the *election precincts,* townships, and some of the cities and towns. (Only Spokane and Whatcom Counties have townships, cities, and towns as primary divisions, though there is also one township in King County.)" (Italics mine.)

The 1950 Federal census—an actual "enumeration of the inhabitants"—discontinued the use of the election precinct as a unit of population for the reasons hereafter noted.

On page XII of *Census of Population: 1950, Vol. II, Characteristics of the Population, Part 47, Washington,* appears the following:

"Minor civil divisions.—To the primary political divisions into which counties are divided, the Bureau of the Census applies the general term 'minor civil divisions.' *The minor civil divisions shown for the State of Washington in previous censuses were the election precincts, a few townships, and some of the cities and towns.* The election precincts are unsatisfactory for statistical purposes, because their boundaries change so frequently as to make comparisons of data from one period to another impossible. *Accordingly, these minor civil divisions were replaced in the 1950 Census by census county divisions, which are newly established special areas which will remain as relatively permanent statistical areas comparable to the minor civil divisions in other states."* (Italics mine.)

Table 6 of this volume (pp. 47-10 to 47-13) sets forth the 1950 population of each county in the state. Under the name

of each county is listed the population of each county census tract and the population of each town used as a unit of population. County population equals the total number of inhabitants in the "minor civil divisions" into which each county has been divided.

Pages 47-21 to 47-39 contain the "Census County Division Descriptions"; tables 7, 8, and 9 (pp. 47-14 to 47-16) set forth the population of towns and cities. The tables are followed by boundary descriptions of the census tracts of the more heavily populated urbanized areas. (pp. 47-17 *et seq.*) Thus, the number of inhabitants and geographic boundaries of each county census tract are determined.

This brings me to a consideration of initiative No. 199, which the voters of this state approved at the general election November 6, 1956. A month later, the governor proclaimed the measure to be law. Laws of 1957, chapter 5.

Initiative No. 199 does not use the election precinct *as a unit of population* for the purpose of forming senatorial and legislative districts.

The heart of the initiative, which establishes the theory of redistricting and reapportionment, reads:

"Sec. 56. Census tracts referred to herein are all the political divisions, subdivisions, census tracts and other terms to describe census divisions used in the current census division system used and approved by the United States Bureau of the Census of the United States Department of Commerce and the detailed descriptions of said division together with detailed maps are one file and available in the Office of Population Research and Washington State Census Board or United States Bureau of Census and the boundaries of census tracts referred to herein are the same boundaries as are shown upon the official documents or maps maintained by or for the United States Bureau of the Census existing as of January 1, 1956, having the same corresponding numbers or names as given to census political divisions." Laws of 1957, chapter 5, p. 17.

The remaining fifty-seven sections of the initiative implement § 56 and establish senatorial and representative districts by grouping *census tracts* and towns, instead of election precincts, where necessary. For example, § 41 of the

initiative provides that the 39th senatorial district shall be composed of census tracts 6, 7, 8, 15, 16, 17, 18 of Snohomish county and the city of Everett. The population of each tract and the city of Everett appears in the source material to which I have referred.

Initiative No. 199 does not abolish the election precinct. If a precinct should be divided by a boundary line of a new senatorial or legislative district, the proper authorities would have to make the proper adjustment; otherwise, initiative No. 199 would appear not to disturb them.

### D. INITIATIVE No. 199 IS CONSTITUTIONAL

The question of the constitutionality of initiative No. 199 has played a larger role in the outcome of the instant case than appears in the majority opinion, which chooses not to discuss the question.

An unsuccessful attempt was made to enjoin the secretary of state from certifying initiative No. 199 for inclusion on the ballot. *State ex rel. Donohue v. Coe*, 49 Wn. (2d) 410, 302 P. (2d) 202 (1956). Although the briefs of the parties in the *Donohue* case presented certain questions relating to the constitutionality of initiative No. 199, both the trial court and this court refused to consider them on the authority of *State ex rel. Griffiths v. Superior Court*, 92 Wash. 44, 47, 159 Pac. 101, 162 Pac. 360 (1916), wherein this court said:

"With the ultimate question of the validity of this proposed legislation, we have no present concern. Courts will not determine such questions as to contemplated legislation which may, perchance, never be enacted."

A careful reading of the return of respondent Victor A. Meyers, as secretary of state, to the order to show cause, discloses that respondent does not question the constitutionality of initiative No. 199.

Respondent states in his return:

"Chapter 5 of the Laws of 1957, prior to amendment by Chapter 289 of the Laws of 1957, contained gross ambiguities, errors and uncertainties, and without the amendment ac-

complished by Chapter 289, Laws of 1957, would have presented difficult problems of administration. . . .

" . . .

"In addition, there were doubts of the validity of the proceedings by which the initiative had been adopted in connection with the petitions and supporting papers, which doubts it was in the public interest to eliminate by legislative action."

"Difficult problems of administration" do not render the initiative unconstitutional. Any doubts "in connection with the petitions and supporting papers" were disposed of by this court in *State ex rel. Donohue v. Coe, supra.*

Further, on the tape recording of oral argument, the following colloquy appears between one of respondent's counsel and members of the bench.

"First Judge: Do you concede that there is an inconsistency between 199 and 289? Mr. Iverson: No question that 289 amended 199 and made a change. First Judge: One or the other has to be followed? Mr. Iverson: That's correct. No question about it.

" . . .

"Second Judge: Regarding your statement that 199 has to be followed, one of your colleagues is contending that 199 is unconstitutional; so how can you say that a ——. Mr. Iverson: He is one of the interveners, Your Honor. I am not responsible for him. I will let him speak for himself. He will be on here in a little while."

It is abundantly apparent that respondent does not question the constitutionality of initiative No. 199.

However, several interveners attack its validity on the ground that the legislative title of the initiative, as supplied by its sponsors to the secretary of state, was omitted from the printed form of the petitions circulated and presented to voters for signature.

There is no merit in this contention for the following reasons:

First: The constitution requires that " . . . such petition shall include the *full text* of the measure so proposed." Washington constitution—Art. II, §1 (amendment No. 7).

(Italics mine.) The word "text" refers to the main body of matter contained therein. It does not include a title.

Second: In *Senior Citizens League, Inc. v. Department of Social Security,* 38 Wn. (2d) 142, 173, 228 P. (2d) 478 (1951), this court said:

"The legislative title [on an initiative] is mere surplusage, since the constitutional provision quoted above [Art. II, § 19] applies only to 'bills.' A bill is a 'form or draft of a law presented to the legislature for enactment.' . . . The term refers to proposed laws pending in the legislature. [Citing authorities.] Many initiatives which have been passed by the people of this state have had no legislative title."

Third: It does not appear in the record before us how or why the proposed legislative title was omitted from the printed forms of the petitions. An analogous situation appears in *Randles v. Washington State Liquor Control Board,* 33 Wn. (2d) 688, 206 P. (2d) 1209 (1949). It was alleged, and admitted by the demurrer, that the secretary of state had not mailed to the voters, within the statutory time, a pamphlet containing a copy of the initiative. The initiative was approved by the voters. This court held it could not consider the allegation and said:

"If such a rule is not adopted and followed, then laws enacted by the law-making bodies are open to scrutiny by the courts to see if every official having any duty to perform in the course of the enactment of the statute did as directed; and if it is found he failed in any respect, the courts must approve his frustration of the will of the people or the legislature. This would enable a careless, inefficient, or corrupt official to nullify legislation by his inaction in the performance of some ministerial duty." (p. 693)

### E. Laws of 1957, Chapter 289, Is an Unconstitutional Repeal of Initiative No. 199

In my mind, the crux of the majority opinion is found in the following quotation from it:

"Since chapter 289 deals with the same subject matter as that contained in initiative 199, namely, redistricting, the legislature had the *unlimited power* to establish methods of redistricting, and *to alter, modify, take away, add to, or*

*change* the various districts *in such manner as it saw fit.*" (Italics mine.)

This effects a drastic change in the power of the people to exercise their right of the initiative. For all practical purposes, it relegates an initiative—no matter what its subject matter—to a position less than an advisory opinion of the public. Assume an initiative is passed by the people in a general election in November. It becomes a law thirty days later. The following January, the legislature meets, and, under the theory of the majority opinion, it may immediately "alter, modify, take away, add to, or change [the initiative] in such manner as it saw fit." This interpretation makes a mockery of the initiative provisions of the constitution, and, therefore, I find myself unable to join in giving judicial sanction to such an interpretation.

After passage by the legislature, the governor permitted Laws of 1957, chapter 289 (substitute senate bill No. 374), to become law without his signature. He stated:

"Reluctantly, I have allowed Substitute Senate Bill No. 374 to become law without my signature. My personal inclination is to oppose any move on the part of the legislature to change substantially an initiative passed by the people of the state.
"  .  .  .
"There exists in my mind a serious question as to whether or not Substitute Senate Bill No. 374 merely amends Initiative 199 or whether it in effect repeals the Initiative  .  .  ." Laws of 1957, p. 1162.

In all respects, except one, Laws of 1957, chapter 289, purports to be a legislative amendment of initiative No. 199.

In the title to chapter 289, the legislature used the words:

"  .  .  .  amending sections 4  .  .  .  and 58, chapter 5, Laws of 1957; *and repealing section 56 of said chapter* and reenacting all other sections of said chapter." Laws of 1957, chapter 289, p. 1147. (Section 56, Laws of 1957, chapter 5, is the same as § 56 of Initiative No. 199, quoted *supra.*)

I have not overlooked the fact that chapter 289 re-enacts eleven sections of initiative No. 199. Five of the sections re-enacted establish a county (§§ 14, 22, 24) or a combination

of counties (§§ 3, 20) as a district; six of the sections re-enacted fix mechanical details common to both. Having *repealed* § 56 of the initiative, which establishes its *modus operandi* (census tracts in which the number of inhabitants is enumerated), the amendatory sections of chapter 289 *substitute election precincts* for census tracts. Thus, the heart of initiative No. 199 was cut out, its theory emasculated by repeal, and the constitutional process thwarted.

I believe that the interpretation which the majority opinion places upon Laws of 1957, chapter 289, is contrary to the provisions of the constitution of this state.

The right of the people to initiate legislation was established in 1912 by amendment to the state constitution. The amendment (amendment No. 7) provides in part:

"Art. 2 § 1. Legislative Powers, Where Vested. The legislative authority of the State of Washington shall be vested in the legislature, . . . but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature . . .

"(a) Initiative: The first power reserved by the people is the initiative. . . .

"(b) Referendum: The second power reserved by the people is the referendum, . . .

"(c) . . . No act, law, or bill approved by a majority of the electors voting thereon shall be amended or repealed by the legislature within a period of two years following such enactment. But such enactment may be amended or repealed at any general regular or special election by direct vote of the people thereon.

"(d) . . . This section is *self-executing*, but legislation may be enacted especially to *facilitate its operation*." (Italics mine.)

In *State ex rel. Donohue v. Coe, supra*, this court quoted with approval from *State ex rel. Case v. Superior Court*, 81 Wash. 623, 632, 143 Pac. 461 (1914), as follows:

"There is strongly suggested, in the language of the constitution and this law, a required liberal construction, to the end that this constitutional right of the people [the initiative] may be *facilitated, and not hampered by either technical statutory provisions or technical construction thereof,*

further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right." (Italics mine.)

In 1952, amendment No. 26 to the state constitution was adopted. It superseded amendment No. 7 (c), quoted *supra*, and provides, in part:

"No act, law, or bill approved by a majority of the electors voting thereon shall be amended or repealed by the legislature within a period of two years following such enactment: *Provided, That any such act, law or bill may be amended within two years after such enactment at any regular or special session of the legislature by a vote of two-thirds of all the members elected to each house with full compliance with section 12, Article III, of the Washington Constitution, and no amendatory law adopted in accordance with this provision shall be subject to referendum.* But such enactment may be amended or repealed at any general regular or special election by direct vote of the people thereon." (Italics mine.)

Amendment No. 26 does but one thing: it inserts the *proviso* (which I have italicized above) between the two quoted sentences of amendment No. 7 (c). It only grants the right to *amend*. The constitutional prohibition against legislative *repeal* of an initiative within two years of its enactment is still retained unimpaired, as well as the right of the people to repeal an initiative "by direct vote of the people thereon."

A *proviso* in a constitution usually refers to the clause or portion of the instrument immediately preceding it. Its office is not to enlarge or extend the section of the constitution of which it is a part, but to restrict the sense, or clarify the meaning of the preceding language. 16 C. J. S., Constitutional Law, § 25.

The language of this court in *State v. Collins*, 94 Wash. 310, 313, 162 Pac. 556 (1917), is applicable to the instant case.

"A constitutional or statutory proviso is a restraint or limitation upon, *and not an addition to,* that which precedes it." (Italics mine.)

All three parts of amendment No. 26 must be recognized. The *proviso* should not be interpreted to exclude that which

precedes it; hence, under the circumstances presented by the problem before us, I cannot join in the reasoning of the majority opinion that the right to *amend* includes the right to *repeal*, for such a conclusion nullifies a portion of amendment No. 26. As Judge Chadwick said in *State ex rel. Mullen v. Howell*, 107 Wash. 167, 173, 181 Pac. 920 (1919), a case relating to the right of referendum, "This case sounds in fundamentals, not in definitions."

The interpretation which the majority opinion places upon this *proviso* neither preserves nor renders effective the constitutional right of the people to exercise the initiative— "The first power reserved by the people . . ." Amendment No. 7 (a).

"Whatever divergence of opinion there may be among the courts touching the meaning of constitutional or statutory provisions relating to the initiative and referendum, we think it safe to say that all courts that have spoken upon the subject agree that such provisions are to be liberally construed, *to the end that these popular legislative rights of the people reserved in the several constitutions where found may be preserved and rendered effective*." (Italics mine.) *State ex rel. Howell v. Superior Court*, 97 Wash. 569, 577, 166 Pac. 1126 (1917).

It is neither necessary nor proper for me to attempt to define the word *amend*, as it is used in the *proviso* of amendment No. 26 to the state constitution, for Laws of 1957, chapter 289, is *not* an amendment of initiative No. 199. It destroys and *repeals* it; hence, Laws of 1957, chapter 289, is unconstitutional.

F. Laws of 1957, Chapter 289, Is Unconstitutional, Regardless of any Relation It May Have to Initiative No. 199.

I agree with the majority opinion that "courts will not inquire into a legislative factual determination, beyond consideration of that which appears upon the face of the act, aided by judicial notice"; but this does not mean that "the courts must perpetually remain in ignorance of what everybody else in the state knows."

As I have previously pointed out, the Federal censuses

for the state of Washington, prior to the 1950 census, were based upon the number of inhabitants in election precincts; hence, districting and apportionment by election precincts, under those censuses, meet our constitutional requirement.

The following facts "are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy":

(a) The legislature has never authorized an enumeration of the inhabitants of this state, by election precincts or otherwise;

(b) The public records disclose only the number of *registered voters* in an election precinct—not the number of inhabitants;

(c) Unless resort is made to the Federal census of 1940—now almost eighteen years old—there is no place to which the legislature or anyone else can turn to determine the number of inhabitants in an election precinct. This deficiency carries over into the legislative districts established by Laws of 1957, chapter 289. For example, § 41 of chapter 289 establishes the thirty-ninth senatorial district as

". . . that part of Snohomish county not included in the thirty-eighth district, and Camano Island of Island County."

Unless the legislature authorizes an enumeration of inhabitants by election precincts, it is my considered opinion that *any* districting and apportionment based upon election precincts as component parts of a senatorial or legislative district—as in Laws of 1957, chapter 289—fails to meet the constitutional requirement of Art. II, § 3.

I believe that respondent should be directed to proceed as chief election officer for all state, city, and town elections and carry out his statutory duties relating thereto in a manner consistent with Laws of 1957, chapter 5 (initiative No. 199).

HILL, C. J., DONWORTH, and FOSTER, JJ., concur with WEAVER, J.