44

[No. 65992-3. En Banc.]
Argued May 27, 1998. Decided December 24, 1998.

JORDAN BROWER, *Appellant,* v. THE STATE OF WASHINGTON,
ET AL., *Respondents.*

48

*Eugster & Haskell*, by *Stephen K. Eugster*; and *Shawn T. Newman*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Jeffrey T. Even* and *James K. Pharris, Assistants*; and *Foster, Pepper & Shefelman, P.L.L.C.*, by *P. Stephen DiJulio, Warren J. Rheaume*, and *Grover E. Cleveland*, for respondents.

MADSEN, J. — This case concerns LAWS OF 1997, ch. 220, and Referendum 48, which provide for construction and financing of new stadium facilities for the Seattle Seahawks, a professional football team. Appellant Jordan Brower raises numerous constitutional challenges to the legislation, primarily in connection with provisions which conditioned referral of Referendum 48 to the people on the payment of costs of the referendum election by a private entity, the "team affiliate." Other challenges are that the Act violates the single subject rule of article II, section 19 of the Washington Constitution, and that it contains an invalid emergency clause. We conclude the legislation is valid and affirm summary judgment in favor of respondents. In reaching this conclusion, we note that our recent decision in *CLEAN v. State*, 130 Wn.2d 782, 928 P.2d 1054 (1996), dictates the result on a number of the issues Brower has raised.

## FACTS

During the 1997 legislative session, the Legislature enacted a bill (the Act) providing for construction and financing of a new football and soccer stadium and exhibition center as a public-private enterprise. LAWS OF 1997, ch. 220. At the time the legislation was considered, Respondent Football Northwest, Inc., had an option to purchase the Seattle Seahawks football team from its owner who wanted to move the team to California. Football Northwest declared it would not exercise the option to purchase, which was to expire unless exercised by July 1, 1997, unless the legislation was enacted.

The Legislature did not pass the bill outright, however. Instead, the Legislature referred sections 101 through 604 of the Act to the people. Among other things, this part of the Act authorizes creation of a public stadium authority by "any county that has entered into a letter of intent relating to the development of a stadium and exhibition center" with a "team affiliate" or entity with a contractual right to become a "team affiliate." Section 102; RCW 36.102.020.[1] The stadium authority can then enter into agreements with a professional football team for development of a new stadium and exhibition center. Sections 105, 106; RCW 36.102.050, .060.

Mr. Brower's constitutional challenges primarily concern sections 605 through 608 of the Act, which were not referred to the people. Section 607 directed the Secretary of State to submit sections 101 through 604 to a vote of the people on or before June 20, 1997. RCW 36.102.803. The Secretary of State designated these sections as Referendum Bill No. 48 pursuant to RCW 29.79.250. Section 607 also directed the Attorney General to prepare an explanatory statement and transmit it to the Secretary of State; directed the Secretary of State to prepare a voters' pamphlet addressing the referendum measure; provided for an accelerated canvass of the results of the election; and provided that the special election would be limited to submission of the Act, i.e., no other ballot measures could be submitted for a vote at the same time. *Id.*

Section 605 stated that "[t]he legislature neither affirms nor refutes the value of this proposal," set forth the Legislature's intent that the voters be provided an opportunity to express their decision, and concluded by stating that "[i]t is also expressed that many legislators might

---

[1]The portions of the Act, LAWS OF 1997, ch. 220, will be referred to either by the Act's section numbers (which correspond to the section numbers of Referendum 48 for those provisions referred to the people), or to their statutory codification, or both.

A "team affiliate" is "a professional football team that will use the stadium and exhibition center, and any affiliate of the team designated by the team. An 'affiliate of the team' means any person or entity that controls, is controlled by, or is under common control with the team." Section 101(10); RCW 36.102.010(10).

personally vote against this proposal at the polls, or they might not." RCW 36.102.801.

Section 606 provided that the Act would be null and void unless the team affiliate entered into an agreement with the Secretary of State to reimburse the state and counties for the cost of a special election to be held on Referendum 48. RCW 36.102.802. A reimbursement agreement for costs of the election was entered into by the Secretary of State and the Seattle Seahawks, Inc., on May 14, 1997. Seattle Seahawks, Inc., immediately assigned all of its interest in and obligations under the agreement to Football Northwest. The expenses have been paid.

Section 608 contained an emergency clause providing that sections 606 and 607 (the provisions for conducting the special election and for reimbursement of the costs of the election) should take effect immediately. LAWS OF 1997, ch. 220, § 608.

The Act had as its legislative title: "AN ACT Relating to a mechanism for financing stadium and exhibition centers and education technology grants; . . . ." LAWS OF 1997, ch. 220, at 1060. While provision was originally made in the Act to use any excess funds collected over bonded indebtedness for computer purchases for schools, i.e., education technology grants, HB 2192, § 24(4), this provision was deleted before passage by the Legislature, although the reference remained in the title. The ballot title of Referendum 48 prepared by the Attorney General and included in the voters' pamphlets and on the ballot stated: "Shall a public stadium authority be authorized to build and operate a football/soccer stadium and exhibition center financed by tax revenues and private contributions?" Clerk's Papers (CP) at 93.

On May 2, 1997, prior to the June 17 date set for the special election, Brower filed a complaint in Thurston County Superior Court against the State seeking an injunction to prevent the election on the basis that the Act contained an invalid emergency clause. In an amended complaint, he also sought declaratory relief, alleging that the

Act is unconstitutional on numerous grounds. On May 21, 1997, Football Northwest moved to intervene. All parties stipulated to an order permitting intervention, which was entered May 27, 1997. On June 9, 1997, the superior court entered an order staying all proceedings until after the June 17, 1997 special election. Referendum 48 was passed by a margin of 51.1% with a voter turnout of 51%.

Following the election, the parties filed cross-motions for summary judgment. The trial court granted summary judgment in favor of the State and Football Northwest. This court granted direct review of Brower's appeal. Respondent Football Northwest has moved to strike portions of Brower's brief. The motion has been passed to the merits.

ANALYSIS
Authority to Submit Referendum 48 to the People

We are reviewing a grant of summary judgment in favor of respondents. Review of summary judgment is de novo, with the appellate court engaging in the same inquiry as the trial court. *Gunnier v. Yakima Heart Ctr., Inc.*, 134 Wn.2d 854, 858, 953 P.2d 1162 (1998). Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

■■ Mr. Brower raises numerous constitutional challenges to the legislation. A statute is presumed to be constitutional and the challenger bears the burden of establishing the unconstitutionality of the legislation beyond a reasonable doubt. *Island County v. State*, 135 Wn.2d 141, 146-47, 955 P.2d 377 (1998); *Leonard v. City of Spokane*, 127 Wn.2d 194, 197, 897 P.2d 358 (1995). The presumption of constitutionality applies to measures approved by the people. *State ex rel. O'Connell v. Meyers*, 51 Wn.2d 454, 458, 319 P.2d 828 (1957); *Washington Fed'n of State Employees v. State*, 127 Wn.2d 544, 558, 901 P.2d 1028 (1995).

The people's power to legislate directly takes two forms,

the initiative and the referendum. CONST. art. II, § 1. An initiative is a proposed law directly from the people through the filing of signed petitions with the Secretary of State. CONST. art. II, § 1(a). An initiative may be an initiative to the people, or to the Legislature. The former is placed directly on the ballot for voter approval or rejection. The latter may be enacted by the Legislature, or the Legislature may decline to act on the measure, in which case it will be placed on the ballot, or the Legislature may enact an alternative to the initiative, in which case both the initiative and the legislative alternative will be placed on the ballot. *Id.*

The referendum is the second power reserved to the people, permitting the voters to approve or reject a measure which has been enacted by the Legislature. CONST. art. II, § 1(b). A measure may be referred to the people in two ways. First, voters may refer a measure by submitting petitions signed by the required number of voters to the Secretary of State within 90 days of the end of the session in which the measure was enacted. *Id.* at § 1(b), (c). Second, the Legislature may refer a measure to the people without the voters petitioning for a referendum. *Id.* This case involves a measure referred to the people by the Legislature.

 1. Conditioning Act on agreement of private party to reimburse costs of special election.

Mr. Brower maintains that the Legislature does not have general authority to refer a matter to the people, but instead has only that authority expressly set out in art. II, § 1(b). Here, the Legislature provided that the Act would be null and void unless the team affiliate entered into an agreement with the Secretary of State to reimburse the state and the counties for the costs of the special election. This, Brower contends, illegally placed the power of referendum in the hands of a private party, because no referendum would occur unless the team affiliate agreed to reimburse the costs of the special election. Brower further argues that aside from art. II, § 1(b), the Legislature does

not have authority to grant a private party the power to perform a legislative act, particularly where, as here, the private party stands to benefit from the legislation. Respondents maintain that the Legislature did not delegate legislative authority, but instead validly conditioned the effectiveness of the Act on third party conduct, i.e., the contingency that a third party reimburse the state and counties for their election costs.

The legislative authority of the State is vested in the Legislature, art. II, § 1, and it is unconstitutional for the Legislature to abdicate or transfer its legislative function to others, *Keeting v. Public Utils. Dist. No. 1*, 49 Wn.2d 761, 767, 306 P.2d 762 (1957).

> [H]owever, conditioning the operative effect of a statute upon a future event specified by the Legislature does not transfer the state legislative power to render judgment to the persons or entity capable of bringing about that event. The Legislature, itself, determines the statute would be expedient only in certain circumstances. The power to make this judgment is not transferred merely because the circumstances may arise at the discretion of others. The substance of the act is complete in itself and the Legislature is the body which rendered the judgment as to the expediency of conditioning the operation of the statute upon the specified event.

*Diversified Inv. Partnership v. Department of Soc. & Health Servs.*, 113 Wn.2d 19, 28, 775 P.2d 947 (1989); *see State v. Storey*, 51 Wash. 630, 632, 99 P. 878 (1909) ("[t]he mere fact that the act does not take effect until the contingency arises does not indicate a delegation of legislative power, even where the contingency depends upon the action of certain persons").

Here, the Legislature determined that it was necessary to condition the Act on a requirement that the costs of the election be paid by the team affiliate in order to avoid the expenditure of any public funds in connection with a public stadium project unless the voters approved the Act. Because this judgment was made by the Legislature, no unconstitutional delegation of legislative authority occurred.

Moreover, the Legislature may condition the effectiveness of legislation on the acts of a private party who may possibly benefit from the legislation. In *Storey*, for example, legislation prohibiting livestock running at large in any county where three-fourths of the lands were fenced required county commissioners to determine whether three-fourths of the county was fenced when ten or more freeholders applied for enforcement of the act. *Storey*, 51 Wash. 630. The effectiveness of the act was thus conditioned on the acts of the freeholders, private persons, who had to apply for enforcement of the legislation, as well as upon private parties having fenced lands within the county. No unconstitutional delegation of legislative powers was found. As in *Diversified Inv.*, the decision of what event made the legislation effective was made by the Legislature, not the third party. Moreover, by applying for enforcement of the act in *Storey*, the freeholders obviously sought to benefit from the provisions of the legislation.[2]

Brower contends, though, that while the Legislature may enact measures whose effectiveness is contingent upon a future event, it has no authority to condition the referral of a measure in such a manner.

The state constitution is not a grant but rather is a restriction on the law-making power. *Clark v. Dwyer*, 56 Wn.2d 425, 431, 353 P.2d 941 (1960). "[T]he power of the legislature to enact all reasonable laws is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitutions." *Id.* The power to enact contingent legislation has clearly been recognized. The question is whether any limitation on this power exists because the legislation is referred to the people.

---

[2]Brower also maintains, however, that a distinction must be drawn between contingent events which are "public happenings" and those which are "private happenings." Our cases do not draw the distinction urged by Brower. Indeed, *Storey* is to the contrary. Moreover, insofar as Brower's argument is that the contingency must relate to public purposes, the argument fails to account for *CLEAN v. State*, 130 Wn.2d 782, 928 P.2d 1054 (1996), where the court held that construction of a major league baseball stadium in King County serves a public purpose.

Article II, section 1(b) of the Washington Constitution provides:

The second power reserved by the people is the referendum, and *it may be ordered* on *any act, bill, law, or any part thereof* passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, [or][3] support of the state government and its existing public institutions, either by petition signed by the required percentage of the legal voters, or *by the legislature as other bills are enacted* . . . .

(Emphasis added.) The Legislature is granted the discretionary authority to refer an enactment to the people for approval or rejection. Art. II, § 1(b) also states that referral shall be "as other bills are enacted," indicating that just as the Legislature can condition the effectiveness of other bills on third party conduct, it can condition the effectiveness of a provision referring an act to the people.

The Legislature has authority both to refer a measure to the people and to condition the effectiveness of an enactment upon the happening of a future event, and nothing in article II, section 1 restrains the Legislature from exercising the two powers in connection with one piece of legislation. Accordingly, section 606 does not unconstitutionally delegate legislative authority to the team affiliate.

2. Authority *to refer only part of an act.*

■ Brower contends that the Legislature cannot refer only part of an act to the people. Here, sections 101 through 604 of the Act were referred to the people, but the sections concerning the Legislature's position on the measure, reimbursement of costs of the special election, conducting the election, and the emergency clause were not referred. Brower contends that while the people can order a referendum "on any act, bill, law, or any part thereof passed by the legislature," the Legislature can order a referendum only "as other bills are enacted[,]" i.e., only if the act is a complete act. CONST. art. II, § 1(a), (b).

---

[3]"Or" was omitted inadvertently, but is read into the provision. *See CLEAN,* 130 Wn.2d at 804 n.7.

This argument is based on a misreading of article II, section 1(b). The provision states in relevant part that a referendum "may be ordered on any act, bill, law, *or any part thereof* passed by the legislature . . . either by petition . . . of the legal voters, or by the legislature as other bills are enacted . . . ." CONST. art. II, § 1(b) (emphasis added). The language plainly means that a referendum may be ordered on a part of any act, bill, or law by either of two methods—petition of the people, or by the Legislature in the same way that it enacts other bills. *See State ex rel. Lofgren v. Kramer,* 69 Wn.2d 219, 221-22, 417 P.2d 837 (1966) (treating words "as other bills are enacted" as relating to the process by which bills are enacted). Under article II, section 1(b) the Legislature can constitutionally order a referendum on only part of an act.[4]

3. Whether legislation can be referred to the people where the Legislature takes no position on the value of the legislation.

Mr. Brower also argues, as part of his claim that only a complete act can be referred to the people, that the Legislature cannot refer a measure on which it has refused to take a position. He maintains that Referendum 48 is unconstitutional because it is in fact an unlawful initiative to the people rather than a referendum. Because the constitution is a restraint on legislative power, Mr. Brower's argument will prevail only if something in or fairly inferable from the state constitution prohibits the Legislature from referring an act while taking no position on its value. *See Clark,* 56 Wn.2d at 431.

Ordinarily, when a bill is passed by the Legislature the Legislature affirmatively adopts the provisions of the bill. The Act is clearly an unusual piece of legislation because the Legislature deliberately took no position on the value of the legislation before referring it to the people. Section 605. Nevertheless, examination of the state constitution

---

[4]Insofar as Brower's argument relates to the sections of the Act providing for the special election, it would be a strange reading of the constitution if we held that the Legislature must refer its decision to provide for referral.

leads to the conclusion that, although unusual, Referendum 48 is a valid referendum.

■ The legislative rights of the people reserved in state constitutions are to be liberally construed in order to preserve them and render them effective. *State v. Superior Court*, 97 Wash. 569, 577, 166 P. 1126 (1917). In accord with this view, this court has rejected technical construction of statutes implementing article II, section 1, as well as the constitutional provision itself, except insofar as "necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right." *Id.* at 578 (quotation marks and citation omitted). For example, in an early case, the court applied a liberal construction of the provision by reading article II, section 1(b) as allowing for a referendum by the Legislature of a joint resolution of the Legislature ratifying the federal constitutional amendment for national prohibition. *State ex rel. Mullen v. Howell*, 107 Wash. 167, 181 P. 920 (1919). The court rejected the notion that the matter could not be referred because it was not "an act, bill, or law" within the meaning of article II, section 1(b).

Thus, we apply a liberal construction to preserve the right of referendum.

■ When the Legislature refers a measure to the people, it leaves the decision whether the measure will become law in the hands of the people. Further, while an initiative must have the signatures of the required percentage of legal voters, as does a referendum ordered by the people via petition, in the case of a referral by the Legislature the Legislature votes to refer a matter which it determines should be decided by the people. Whether the Legislature has affirmed the value of the measure or not, that vote assures that the Legislature has made a representative determination that the people should decide whether the measure becomes law. These considerations lead us to reject Brower's narrow construction as impeding the right of referendum. Whether the Legislature takes a stand on the merits of the legislation or not, the Legislature must vote

to send the matter to the people and the people then make the final decision as to whether the matter becomes law.

We do not find anything in or fairly inferable from the state constitution which indicates that the Legislature's power is restrained in this regard.

■ Because we find the Legislature had authority to refer Referendum 48, it follows that we reject Brower's contention that the measure is actually an initiative to the people which is unlawful because it lacks sufficient signatures on a petition. Legislation may be referred to the people without petition signatures when the Legislature votes to refer.

## Veto Power

■ Brower maintains that the Act unconstitutionally granted a veto power to Football Northwest in violation of article III, section 12 of the Washington State Constitution which vests the right to veto legislation in the hands of the Governor. Brower apparently reasons that because the team affiliate could decline to agree to reimburse the costs of the special election, it had the power to veto the Act.

Brower cites no authority for the proposition that a third party's failure to act to bring about an event upon which the effectiveness of legislation is contingent would constitute a veto within the meaning of the constitution. Moreover, in this case, the Legislature itself made the determination that the Act would be null and void unless a reimbursement agreement was entered. Section 606 did not allow a possibility of a second entity overriding the Legislature's intent. There is no merit to the argument that the veto power has been unlawfully transferred to a private party.

## Special Legislation

Mr. Bower maintains that the referendum on sections 101 through 604 of the Act constitutes special legislation in violation of article II, section 28 of the Washington State

Constitution. He maintains that the Act provides that a single entity, the team affiliate, benefits from the legislation by agreeing to reimburse the costs of the special election. This challenge appears to relate to the entire Act.

Initially, Respondent Football Northwest urges the court to decline to consider this issue on the ground that Brower did not assert a special legislation claim in his complaint. An issue which was not raised in summary judgment proceedings ordinarily will not be considered on appeal. 4 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE 560 (1992); *see, e.g., Lewis v. Bell*, 45 Wn. App. 192, 196-97, 724 P.2d 425 (1986). However, the record shows the issue was before the trial court, and we will address it.

 CONST. art. II, § 28(6) provides in relevant part that "[t]he legislature is prohibited from enacting any private or special laws in the following cases . . . For granting corporate powers or privileges." Special legislation is legislation which operates upon a single person or entity while general legislation operates upon all things or people within a class. *CLEAN*, 130 Wn.2d at 802; *Convention Ctr. Coalition v. City of Seattle*, 107 Wn.2d 370, 380, 730 P.2d 636 (1986). A class may consist of one person or corporation provided the law applies to all members of the class. *CLEAN*, 130 Wn.2d at 802; *Convention Ctr.*, 107 Wn.2d at 380. However, it is not what the law includes, but rather what it excludes, which is the test of special legislation. *Island County v. State*, 135 Wn.2d 141, 150, 955 P.2d 377 (1998). " 'Thus, to survive a challenge as special legislation, any exclusions from a statute's applicability, as well as the statute itself, must be rationally related to the purpose of the statute.' " *Id.* (quoting *City of Seattle v. State*, 103 Wn.2d 663, 674-75, 694 P.2d 641 (1985)).

Mr. Brower argues the legislation applies to a single entity. He emphasizes language in the act defining "team affiliate" as "*a*" professional football team and any affiliate of "*the*" team designated by the team, and stating that an " 'affiliate of the team' means any person or entity that

controls, is controlled by, or is under common control with *the* team." Section 101(10); RCW 36.102.010(10) (emphasis added). He also points out that the Act provides that if the voters reject sections 101 through 604, the Legislature will not pass any similar measure "for *the* team affiliate," section 604; RCW 36.102.800, and cites other references to *"the* team affiliate" in section 106, RCW 36.102.060 and Section 606, RCW 36.102.802.

 The Act is not special legislation. The Act allows for "any county" to create a public stadium authority if the county has entered into a letter of intent relating to the development of a stadium and exhibition center with a team affiliate or entity with a contractual right to become a team affiliate. Section 102; RCW 36.102.020. The stadium authority can then enter into agreements with a professional football team for development of a new stadium and exhibition center. Sections 105, 106; RCW 36.102.050, .060. The definition of a "team affiliate" is "a professional football team that will use the stadium and exhibition center, and any affiliate of the team designated by the team. An 'affiliate of the team' means any person or entity that controls, is controlled by, or is under common control with the team." Section 101(10); RCW 36.102.010(10). A "professional football team" is "a team that is a member of the national football league or similar professional football association." Section 101(5); RCW 36.102.010(5).

The legislation applies to a class—any county is authorized to form a public stadium authority provided it satisfies the letter of intent requirement. *See CLEAN*, 130 Wn.2d at 802 (holding that legislation concerning construction and financing of a baseball stadium which applies only to counties of a certain size was not special legislation, even where only one county had a population of that size— possibility existed that another county could reach the given population in the future). Moreover, the term "team affiliate" also refers to a class, because it includes any national football league team or a team of a similar association, and affiliates designated by such a team. Finally, the

exclusions from the Act's provisions are rational. Counties which have not entered a letter of intent would not be in a position to have a professional football team playing its home games at a stadium in the county.

### Lending of Credit

Mr. Brower contends that the state advanced funds and services to conduct the special election on Referendum 48, and this constituted lending of credit to a private party, the team affiliate, which was obliged to reimburse these costs. His premise is that the election was an election solely to benefit a private party, and the election costs were the costs of the private party.

█ █ Article VIII, section 5 of the Washington State Constitution provides that "[t]he credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation." The purpose of this provision is to " 'prevent state funds from being used to benefit private interests where the public interest is not primarily served.' " *CLEAN*, 130 Wn.2d at 797 (quoting *Japan Line, Ltd. v. McCaffree*, 88 Wn.2d 93, 98, 558 P.2d 211 (1977)). The first step in deciding whether a gift or loan of public funds has been made is to determine if the funds have been expended to carry out a fundamental purpose of government. *CLEAN*, 130 Wn.2d at 797. If so, no gift or loan of public credit has occurred.

█ █ As Respondents contend, there can be no doubt that a special election on a referendum measure is a governmental purpose. If there was any "lending" of credit, it was for a governmental purpose. However, it is difficult to agree that any lending of credit occurred, because the government generally bears the costs of special elections on referenda. RCW 29.13.045, .047. Here, a private entity agreed to reimburse the state and local governments for *their* costs. For these reasons, we hold that no lending of state credit occurred.

### Equal Protection; Ballot Access on Basis of Wealth

Brower argues that the Act violates equal protection

principles of the state and federal constitutions because it allows ballot access to be based upon wealth. Mr. Brower does not argue that a different analysis applies under the state privileges and immunities clause than applies under the Equal Protection Clause.

There is no question that this case is unusual because a private entity funded a vote on a matter from which, if the voters approved, the private entity stood to benefit. Troubling questions may arise, such as whether any wealthy entity could persuade the Legislature to place a measure on the ballot provided the costs of the election were paid, and whether by declining to take a position on the measure and requiring that election costs be reimbursed the Legislature abdicated its role as a representative body. Those, however, are different considerations than whether the Act provides unconstitutional ballot access based upon wealth.

 Brower relies upon cases concerning poll taxes and fees required of candidates in order to appear on the ballot. In *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966), the Court invalidated a poll tax on equal protection grounds. Here, however, no person was denied the right to vote based upon ability to pay. In *Bullock v. Carter*, 405 U.S. 134, 92 S. Ct. 849, 31 L. Ed. 2d 92 (1972), the Court invalidated Texas law providing that candidates had to pay fees in order to appear on the ballot. In *Lubin v. Panish*, 415 U.S. 709, 94 S. Ct. 1315, 39 L. Ed. 2d 702 (1974), the Court invalidated a California statute requiring a ballot access fee based upon the salary for the office sought. Both *Bullock* and *Lubin* involve a candidate's right to participate in an election, not a ballot measure as in this case. Brower cites no authority which directly supports his claim that the Act unconstitutionally allows ballot access to be based on wealth in violation of equal protection.

The State reasons that the referendum and initiative rights in article II, section 1 are available without regard to wealth, and therefore there is no classification depriving

the voters of direct legislation rights because they lack the ability to pay election costs. Voters can propose an initiative to the people or to the Legislature, and may petition for a vote on legislation enacted by the Legislature. Respondents note that in addition to the people's right to petition to place a measure on the ballot, the Legislature also has the constitutional right to place a referendum measure on the ballot. The Legislature could have enacted legislation providing for a public stadium and exhibition center without ordering a referendum (as it did for a baseball stadium in King County). The Legislature also could have ordered a referendum without requiring a reimbursement agreement. Accordingly, placement of a measure on the ballot does not depend upon wealth. Respondents' arguments are sound.

Finally, we note that even if there were a legitimate reason for concluding that access to the ballot had been granted on the basis of wealth, no equal protection violation would be found because even if the team affiliate gained ballot access based upon wealth, the people have an alternative means to place a measure on the ballot through the petition process. *See Lubin*, 415 U.S. at 718 (candidate's access to ballot based upon wealth not violative of equal protection where the state provides a reasonable alternative means for ballot access).

We do not agree that the Legislature has unconstitutionally provided ballot access on the basis of wealth.

## Right to Political Speech

Mr. Brower argues that his First Amendment political speech and equal protection rights were violated because the Legislature scheduled the special election on Referendum 48 to take place less than 60 days after the Act was enacted by the Legislature. He claims, without support, that one of the purposes of the Act was to make it possible for moneyed interests to "drown out the voices of the less affluent." Br. of Appellant at 26-27. He points out that the proponent of the measure spent millions of dollars in

campaigning on its behalf. He evidently believes that he should have been permitted more time to raise funds. Although not stated, his argument might also suggest that expenditures on behalf of Referendum 48 should have been limited.

Initially, the validity of the emergency clause which permitted the election to occur less than 90 days after the 1997 legislative session is discussed below. The issue here is whether the short timetable unconstitutionally deprived Brower of an opportunity to raise funds to oppose the referendum in violation of the First Amendment, or whether the disparity in funding otherwise violated his political speech rights or equal protection.

The influence of money in politics has been the subject of much attention. Many commentators have noted the power of private wealth to shape the nature and outcome of elections. *E.g.*, Jamin Raskin & John Bonifaz, *Equal Protection and the Wealth Primary*, 11 YALE L. & POL'Y REV. 273 (1993). The concerns about the influence of wealth in politics has been noted in connection with ballot propositions as well as in connection with candidates for public office. *E.g.*, Richard Briffault, *Ballot Propositions and Campaign Finance Reform*, 1996 ANN. SURV. AM. L. 413 (1996). Despite the commentary, and the controversy, it is clear that rather than mandating equality in spending on a ballot measure, the First Amendment prohibits a state from limiting contributions for and against ballot measures.

In *Buckley v. Valeo*, 424 U.S. 1, 48-49, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976), the United States Supreme Court said that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." Governmental regulation of campaign money must be subjected to the exacting scrutiny applicable to core First Amendment rights of political speech. *Id.* at 44. In effect, money is central to effective communication of information concerning candidates and issues. Where a political candidate's campaign is concerned, the prevention of cor-

ruption and the appearance of corruption are sufficient governmental interests justifying limitations on individual and political action committee contributions to a campaign. However, the Court found no such corrupting influence attributable to overall campaign expenditures or from personal or family resources, and no other governmental interest sufficient to justify restrictions on overall campaign expenditures or expenditures by a candidate from personal or family resources. *Id.* 51-58. Thus, the total amount spent on a campaign, and the amount from personal and family sources, could not be limited by the state.

In the area of ballot measures, as opposed to candidates for office, the danger of corrupting officeholders through campaign contributions is generally absent. "[D]onations to initiative campaigns, or direct expenditures in connection with ballot propositions, rarely pose a danger of corrupting elected officials since there is no one to corrupt in such elections." Richard Briffault, 1996 ANN. SURV. AM. L. at 422. The Court has held that the First Amendment prohibits the states from limiting the dollar amounts of contributions for and against ballot measures in order to "equalize" the information presented on both sides. *Citizens Against Rent Control/Coalition for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 297-98, 102 S. Ct. 434, 70 L. Ed. 2d 492 (1981). The Court reasoned that a ballot measure is about ideas, and does not afford the opportunity for an expectation of a quid pro quo, unlike the situation where a candidate runs for office. *Id.*; *see also First Nat'l Bank v. Bellotti*, 435 U.S. 765, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978) (invalidating a state law barring corporations from campaign expenditures on ballot measures).

Thus, no one has a right to equal funding to advocate or oppose a ballot measure. Further, Brower fails to show a governmental interest which would be sufficient to justify the Legislature in considering his ability to raise funds when providing for the election, or to justify the Legislature in restricting expenditures of advocates of Ref-

erendum 48. No First Amendment or equal protection violation has occurred as a result of the Legislature's failure to do so.

Brower's rights to political speech and equal protection were not violated by the scheduling of the special election.

### One Person—One Vote

■ Mr. Brower argues that the equal protection principle of one person-one vote was violated because the team affiliate could decide whether to agree to reimburse the state and local governments for the costs of the special election, and this constituted a "vote."

The Equal Protection Clause requires that equal participation in the election process be accorded all citizens. *Reynolds v. Sims*, 377 U.S. 533, 565-66, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964). Thus, in establishing voting districts within a state, the districts must have " 'substantial equality of population' " in order to insure that " 'the vote of any citizen is approximately equal in weight to that of any other citizen in the State.' " *Story v. Anderson*, 93 Wn.2d 546, 549-50, 611 P.2d 764 (1980) (quoting *Reynolds*, 377 U.S. at 579). In addition, district lines must not be drawn in a way which invidiously dilutes the voting strength of a particular racial or political group. *Story*, 93 Wn.2d at 549 (citing *White v. Regester*, 412 U.S. 755, 765-70, 93 S. Ct. 2332, 37 L. Ed. 2d 314 (1973)).[5]

The difficulty with Brower's argument is that a statewide vote occurred on Referendum 48 without any "districts" involved. Moreover, the team affiliate as an entity had no vote in the special election. Mr. Brower's vote was not outweighed by any other vote.

---

[5]More recent United States Supreme Court cases add to the analysis where racial gerrymandering is alleged. *See Miller v. Johnson*, 515 U.S. 900, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995) (clarifying *Shaw v. Reno*, 509 U.S. 630, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993)).

No violation of the one person-one vote principle occurred.

## Right to a Free and Equal Vote

Mr. Brower contends that the ability of the team affiliate to decide whether to reimburse the costs of the special election constitutes a vote which carries more weight than his and those of other voters in the state, and thus violates his right to a free and equal vote under article I, section 19 of the Washington State Constitution.

 Article I, section 19 provides that "[a]ll Elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." The right to vote is fundamental, and article I, section 19 provides greater protection for a free and equal vote than does the federal constitution's one person-one vote equal protection right. *Foster v. Sunnyside Valley Irrigation Dist.*, 102 Wn.2d 395, 687 P.2d 841 (1984). Article I, section 19 requires "that otherwise qualified voters who are significantly affected by the results of an election be given an opportunity to vote in that election." *City of Seattle v. State*, 103 Wn.2d 663, 673, 694 P.2d 641 (1985).

Article I, section 19 is not implicated in this case. The only election involved is the election on Referendum 48. Mr. Brower's right to vote in that election was not impeded in any way. Moreover, the team affiliate did not have a vote at all. The reimbursement provision did not grant a voting right, but conditioned the effectiveness of the legislation.

There was no violation of Mr. Brower's right to a free and equal vote.

## Fundamental Principles; Public Policy

Mr. Brower contends the Act is unconstitutional because it violates fundamental principles in violation of article I, sections 1 and 32 of the Washington State Constitution and is against public policy in light of other constitutional violations he claims result from the Act.

Article I, section 32 provides that "[a] frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." This provision has primarily been viewed as an interpretative mechanism in connection with individual rights, and has also been used to define principles of state and local government. *Seeley v. State*, 132 Wn.2d 776, 809-12, 940 P.2d 604 (1997). The court has reasoned that the provision emphasizes the importance of individual rights provided in CONST. art. I, §§ 1-31. *Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 780-81, 819 P.2d 370 (1991). Article I, section 32 has not been interpreted as providing substantive rights in and of itself. The Act does not otherwise violate the constitution, and we will not apply article I, section 32 to overturn the measure.

Mr. Brower's claims of violation of public policy are duplicative of his claims that numerous constitutional provisions have been violated.

We hold that the Act does not violate fundamental principles or public policy.

### Article II, section 19; Multiple Subjects Prohibition

Mr. Brower maintains that the Act is unconstitutional because it violates the single subject rule of article II, section 19 of the Washington State Constitution.

Article II, section 19 provides: "No bill shall embrace more than one subject, and that shall be expressed in the title." The policies underlying the constitutional provision are the prevention of " 'logrolling,' or pushing legislation through by attaching it to other necessary or desirable legislation," and general notice to members of the legislature and the public of what is contained in the proposed legislation. *State v. Thorne*, 129 Wn.2d 736, 757, 921 P.2d 514 (1996); *see Washington Fed'n of State Employees v. State*, 127 Wn.2d 544, 552, 901 P.2d 1028 (1995).

1. Title of Act.

Brower first claims that the Act's title violates

article II, section 19. The initial question is whether the legislative title or the ballot title is the relevant title. In *Washington Federation* the court held that the ballot title is the relevant title where an initiative is voted on by the people, noting among other things that it is the ballot title with which the voters are faced when voting. *Washington Fed'n*, 127 Wn.2d at 555. (The court also noted that not all initiatives have legislative titles.) In *State v. Broadaway*, 133 Wn.2d 118, 942 P.2d 363 (1997), the court held that where an initiative to the Legislature was enacted by the Legislature, the legislative title, which is the title before the legislators when voting on the measure, is the relevant title.

In this case, sections 605 through 608 of the Act were enacted by the Legislature, while sections 101 through 604 comprised Referendum 48 which the voters approved in the special election. Because the people made the final decision as to whether Referendum 48 would be the law, the ballot title is the relevant title to assess that part of the legislation for compliance with article II, section 19 in light of *Washington Federation*. However, the people did not vote on sections 605 through 608. Consistent with *Washington Federation* and *Broadaway*, the legislative title is the relevant title for these sections of the Act; the ballot title was not before the Legislature.[6]

The ballot title of Referendum 48 provided: "Shall a public stadium authority be authorized to build and operate a football/soccer stadium and exhibition center financed by tax revenues and private contributions?" CP at 93. Mr. Brower does not claim that this title violates article II, section 19.

As to the Legislature's enactment of sections 605 through 608, the Legislative title states: "AN ACT Relating to a mechanism for financing stadium and exhibition centers

---

[6]In this regard, we note that sections 605 through 608 do not merely provide for a special election on a referendum measure. The sections also contain the provisions conditioning the effectiveness of the legislation on the acts of the team affiliate. Accordingly, we are not required to address the question whether provisions only providing for referral of a measure are subject to article II, section 19.

and education technology grants; . . . ." Laws of 1997, ch. 220, at 1060. Brower maintains that the subject "education technology grants" is a second subject which is not included in the Act. As noted, a provision concerning education technology grants appeared in HB 2192, § 24(4), but was deleted before passage by the Legislature.

 Where the Legislature removes a provision from a bill by amendment, but a reference to that provision continues to appear in the title, no violation of article II, section 19 occurs. *State v. Carroll*, 81 Wn.2d 95, 102, 500 P.2d 115 (1972). In *Carroll*, the title stated that a statute had been amended, but the amending section of the bill was removed before passage. The title continued to refer to amending the statute. The court said that "the portions of the title which were inadvertently left in after the bill itself was amended are surplusage" and the title did not violate article II, section 19. *Id.* at 102.

 We add that the enrolled bill doctrine forbids an inquiry into whether the Legislature might have been misled by a continued reference in the title to material deleted from an act. *State ex rel. Washington Toll Bridge Auth. v. Yelle*, 61 Wn.2d 28, 33, 377 P.2d 466 (1962). While Brower claims that the court found no second subject in the title in *Yelle*, the court in *Carroll* refused to even consider whether the reference in the title to an amendment would have been a reference to a second subject where the amending provision had been deleted from the body of the act.

Under *Carroll*, the legislative title does not violate article II, section 19.

2. Second subject in Act

Mr. Brower also argues that the Act contains a second subject, a "private" election, which is not expressed in the title. Again, his starting point is the legislative title. (Since Referendum 48 did not contain the election provisions, it would not, in any case, be subject to this challenge.)

 This claim is unpersuasive. First, the Legislature is constitutionally entitled to refer a measure to the people.

CONST. art. II, § 1(b). We will not read into the state constitution a requirement that any time the Legislature refers a matter it must enact a separate piece of legislation to provide for the election, which is what Brower's argument, if accepted, would require. Further, the legislation enacted by the Legislature included the provisions referring the measure to the people and the election procedures involved. The legislative title, in addition to that part quoted above, listed statutes which would be amended or newly created, and added: "providing a contingent expiration date; *providing for the submission of certain sections of this act to a vote of the people*; and declaring an emergency." LAWS OF 1997, ch. 220, at 1060 (emphasis added). The election provisions were clearly encompassed within the title.

In summary, we hold that the ballot title is the relevant title insofar as Referendum 48 is concerned, and that the legislative title is the relevant title insofar as the Legislature enacted part of the Act which was not referred to the people. We find no violation of article II, section 19.

## Emergency Clause

Mr. Brower contends that section 608, the emergency clause relating to the reimbursement and election provisions, is invalid. He asserts that the purpose of the clause is to permit an election at a time dictated by the team affiliate. He argues that the clause is an obviously false and palpable attempt at dissimulation because the Legislature itself was neutral on the value of the Act and so no emergency existed. If an emergency had existed, Brower urges, the state would have paid the costs of the election.

Article II, section 1(b) provides in part that the power of referendum reserved by the people may be ordered on any legislation "except such laws as may be necessary for the immediate preservation of the public peace, health or safety . . . ." An emergency clause is tested against this standard. *CLEAN*, 130 Wn.2d at 803-12.

Mr. Brower's argument is not persuasive in light

of *CLEAN*. The court there held that construction of a major public sports stadium is a proper exercise of the State's police power. *Id.* at 805-06. The court also held in that case that the stadium act concerning new baseball stadium facilities for the Seattle Mariners was necessary for the immediate preservation of the public peace, health or safety. The court noted that an emergency clause is given effect " 'unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, [the court] will enter upon no inquiry as to the facts' " and will give the declaration every favorable presumption. *Id.* at 807 (quoting *State ex rel. Humiston v. Meyers*, 61 Wn.2d 772, 778, 380 P.2d 735 (1963)). " 'Legislative declarations of fact, such as the existence of an emergency, are deemed conclusive unless they are "obviously false and a palpable attempt at dissimulation." ' " *Id.* at 808 (citations omitted). The court determined from the record in that case that a real emergency existed because the public purpose sought to be achieved by passage of the stadium act would be unattainable if the Mariners franchise were sold to investors before the Legislature could assure the owners that a new facility would be built in King County. *Id.* at 809-11.

In this case, submission of Referendum 48 clearly constitutes a public purpose because the state constitution expressly provides for the Legislature to refer enactments to the people at a special election. CONST. art. II, § 1(b), (d). The referendum itself concerns a public sports stadium, also a public purpose. *CLEAN*, 130 Wn.2d at 805-06. The referral and election provisions were also necessary for the *immediate* preservation of the public peace, health, or safety. *See id.* at 804, 808-09. The record shows that if these provisions had not been declared an emergency, they would not have taken effect until 90 days after the end of the legislative session, after Football Northwest's option to purchase the Seahawks expired. The then current owner of the Seahawks wanted to move the team from Washington. Football Northwest would help finance the cost of new facilities, but declared it would do so only if voters approved

Referendum 48. In order for the legislation to achieve its purpose, the election had to be held before the option expired. The purpose of the legislation, construction of a public sports stadium and exhibition center provided the people approved of it, would not have been achievable unless sections 605 through 608 were effective before Football Northwest's option expired. In other words, it was the need for an expeditious vote, not the need to construct a stadium, which constituted the emergency.[7]

Further, the Legislature directed accelerated canvassing of the election results, thus indicating its decision that a prompt determination of election results was needed. Similar to the situation in *CLEAN*, the record demonstrates that the purpose of the stadium act in this case would be unattainable without the Legislature's declaration of an emergency and accordingly the declaration was not obviously false.

The dissent's analysis unfortunately paints an incomplete picture. The dissent offers two scenarios, neither of which reflects the actual circumstances. The dissent believes that either "emergency" relates solely to the election process in and of itself, or "emergency" relates to legislation on which the Legislature took no position. But at issue is not merely an election nor merely legislation on which the Legislature took no position. The Legislature by majority vote determined that the people of this state should decide whether to commit public funds to a public sports stadium, and if the voters approved, the stadium would be constructed. That purpose would be utterly thwarted if the election provisions did not take effect before Football Northwest's option expired. The people's right to vote on a legislatively referred matter would have been rendered completely meaningless without the emergency clause.

 Moreover, we are not faced with a new issue or one

---

[7]Notably, the emergency clause in section 608 did not apply to the provisions of the Act concerning construction of a public sports stadium and exhibition center, sections 101 through 604, but instead applied to only the special election and reimbursement provisions, sections 606 and 607.

of first impression in this case. Following the dissent's approach would require that we overrule recently decided precedent. *See CLEAN v. State*, 130 Wn.2d 782, 928 P.2d 1054 (1996). Overruling a prior decision should not be undertaken lightly. *Keene v. Edie*, 131 Wn.2d 822, 831, 935 P.2d 588 (1997). This is especially true where the precedential case is recent and the varying views on the issue thoroughly explored in the case.

 Next, Mr. Brower contends that his right of referendum will be violated if the court does not declare the emergency clause invalid. However, with regard to sections 101 through 604 of the Act, the right of referendum does not provide a basis to delay an election on a matter already referred to the people. In *Langdon v. City of Walla Walla*, 112 Wash. 446, 468, 193 P. 1 (1920), the court rejected a challenge that an emergency clause denied the right to referendum where the measure already provided for a referendum. As Respondents put it, Mr. Brower does not have a right to a referendum on a referendum. With regard to sections 605 through 608 of the Act, our conclusion that the emergency clause is valid precludes any argument that Brower's right to referendum has been denied.

Mr. Brower also urges that his right to free political speech will be violated if the court simply applies the standard for validity of emergency clauses which it utilized in *CLEAN*. He maintains that where political speech is concerned, an emergency clause must satisfy the "exacting scrutiny" standard applicable when a law burdens core political speech. *See, e.g., First Nat'l Bank v. Bellotti*, 435 U.S. 765, 786, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978).

While political speech is involved where a campaign on a ballot measure is involved, Mr. Brower's political speech rights have not been unconstitutionally infringed as a result of the election schedule, as discussed above. That election schedule was, of course, made possible by the declaration of emergency. Given these considerations, we decline to discuss whether the standard for assessing an emergency clause should be different where political speech might be adversely impacted.

The emergency clause in section 608 is valid.

## Severability

Mr. Brower contends that unconstitutional provisions of the Act cannot be severed from the remainder of the Act. Because we do not find any of the provisions unconstitutional, we do not reach this issue.

## Motion to Strike

Football Northwest has moved pursuant to RAP 10.4(d) to strike portions of Mr. Brower's brief on the ground that Brower has made factual assertions unsupported by evidence and legal conclusions unsupported by authority. Football Northwest objects to Brower's claim that Football Northwest had a "veto," that the burden of proof is on Respondents (Football Northwest seriously misrepresents Brower's argument—Brower clearly states that the burden is on him, but suggests in a footnote that it "might be contended" that burden should be on Respondents), that a decision outside an election is a "vote," that the Legislature cannot order a referendum on only a part of an act, that the Legislature did not enact the Act, and that Brower has a right to have a referendum on a referendum. The motion is contained in Football Northwest's brief.

While the court can refuse to consider assertions and argument which fail to comply with RAP 10.4(d), the items complained about have more to do with Brower's characterization of the effect of the Legislation than with unsupported factual assertions or incorrect statements of law.

In any event, a party may include in a brief only a motion which, if granted, would preclude hearing the case on the merits. RAP 17.4(d). Granting Football Northwest's motion would not preclude hearing this case on the merits, and accordingly the motion will not be considered. *Lawson v. State*, 107 Wn.2d 444, 448, 730 P.2d 1308 (1986).

## CONCLUSION

The trial court's grant of summary judgment in favor of

Respondents is affirmed. The motion to strike is not properly before the court and will not be considered.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, ALEXANDER, and TALMADGE, JJ., concur.

SANDERS, J. (dissenting) — Our state constitution article II, section 1, guarantees the people's right to referendum, subject only to a specific exception, and article II, section 28(6), absolutely prohibits special laws "for granting corporate powers or privileges," without exception. As it is the duty of this court to uphold the constitution in general, and these provisions in particular, I must dissent from an errant majority. It is not the role of the court to run interference for legislative excess, nor score points for corporate wealth, but to protect the constitutional rules of the game.

### CONSTITUTIONAL RIGHT TO REFERENDUM

Article II, section 1(b), of the Washington Constitution plainly provides a referendum may be ordered on "any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety . . . ." The first question before us, therefore, is whether sections 606 and 607 of the subject legislation fit within the constitutional exception to the general right of referendum. *See* LAWS OF 1997, ch. 220, §§ 606, 607.

Section 606[8] exclusively vests in the Seahawks the option to pay for, and thus hold, a special election; whereas section 607[9] details the subject of and procedure by which an the election might be held.

---

[8]LAWS OF 1997, ch. 220, § 606, provides:

Notwithstanding any other provision of this act, this act shall be null and void in its entirety unless the team affiliate as defined in section 101 of this act enters into an agreement with the secretary of state to reimburse the state and the counties for the full cost of the special election to be held on or before June 20, 1997.

[9]LAWS OF 1997, ch. 220, § 607, provides:

The majority opines the requirements of the constitutional exception to the people's right of referendum has been met based upon (1) the "emergency" clause in the legislation itself,[10] and (2) a statement in the record that Football Northwest's option to purchase the Seahawks would expire shortly after the legislation was passed. Ma-

(1) The secretary of state shall submit sections 101 through 604 of this act to the people for their adoption and ratification, or rejection, at a special election to be held in this state on or before June 20, 1997, in accordance with Article II, section 1 of the state Constitution and the laws adopted to facilitate its operation. The special election shall be limited to submission of this act to the people.

(2) The attorney general shall prepare the explanatory statement required by RCW 29.81.020 and transmit that statement regarding the referendum to the secretary of state no later than the last Monday of April before the special election.

(3) The secretary of state shall prepare and distribute a voters' pamphlet addressing this referendum measure following the procedures and requirements of chapter 29.81 RCW, except that the secretary of state may establish different deadlines for the appointment of committees to draft arguments for and against the referendum, for submitting arguments for and against the referendum, and for submitting rebuttal statements of arguments for and against the referendum. The voters' pamphlet description of the referendum measure shall include information to inform the public that ownership of the King-Dome may be transferred to the public stadium authority and that the King-Dome will be demolished in order to accommodate the new football stadium.

(4) A county auditor may conduct the voting at this special election in all precincts of the county by mail using the procedures set forth in RCW 29.36.121 through 29.36.139.

(5) Notwithstanding the provisions of RCW 29.62.020, the county canvassing board in each county shall canvass and certify the votes cast at this special election in that county to the secretary of state no later than the seventh day following the election. Notwithstanding the provisions of RCW 29.62.120, the secretary of state shall canvass and certify the returns from the counties no later than the ninth day following the special election.

(6) The secretary of state shall reimburse each county for the cost of conducting the special election in that county in the same manner as state primary and general election costs are reimbursed under RCW 29.13.047(1) and (3).

(7) No other state, county, or local election shall be required or held on any proposition related to or affecting the stadium and exhibition center defined in section 101 of this act.

[10]LAWS OF 1997, ch. 220, § 608, the "emergency clause," of the act provides:

Sections 606 and 607 of this act are necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions, and take effect immediately.

jority at 73. The majority also claims its result is required by our holding in *CLEAN v. State*, 130 Wn.2d 782, 792-93, 928 P.2d 1054 (1996) (*CLEAN*-I). I disagree.

Although profound reservations about the *CLEAN*-I decision were expressed in the dissent to that majority opinion, its dictates were followed in *CLEAN v. City of Spokane*, 133 Wn.2d 455, 947 P.2d 1169 (1997) (*CLEAN*-II), *cert. denied*, 119 S. Ct. 45 (1998), as they must be followed until, or unless, overruled. *See CLEAN*-II, 133 Wn.2d at 478 (Sanders, J., concurring) ("Once the constitutional well has been poisoned, we all must drink from it lest the incentive to correct our mistakes in a principled fashion be lost by inconsistently imposing them."). But in this case the majority goes beyond the holding of *CLEAN*-I to achieve its result.

The dissent to the majority in *CLEAN*-I opined the court there had abdicated its judicial role by deferring to legislative excess at the expense of the people who have the constitutional right to themselves legislate through initiative and referendum. *See CLEAN*-I, 130 Wn.2d at 821 (Sanders, J., dissenting). However such deference, not of constitutional origin, persuaded the *CLEAN*-I majority to credit the so-called emergency clause affixed to the baseball stadium tax bill with a status of objective truth neither present in nature nor otherwise apparent from even the face of the legislation. But here we go one step beyond *CLEAN*-I by actually discounting a legislative declaration incompatible with the existence of the alleged constitutional emergency at issue; i.e.,

> The legislature neither affirms nor refutes the value of this proposal, and by this legislation simply expresses its intent to provide the voter of the state of Washington an opportunity to express the voter's decision. It is also expressed that many legislators might personally vote against this proposal at the polls, or they might not.

LAWS OF 1997, ch. 220, § 605. *Compare CLEAN*-I, 130 Wn.2d at 807 ("In reviewing legislative declarations of emergency we are to give substantial deference to the Legislature.").

Moreover the majority focuses upon whether a "real emergency existed" (Majority at 73), although the operative constitutional provision never uses the word "emergency," but rather references the need for "immediate preservation" of the "public peace, health or safety . . . ." CONST. art. II, § 1(b). The majority's analysis thereby erroneously collapses the operative constitutional text into simply a requirement for "immediacy" without regard to the particular nature of the problem in substance; e.g., does the problem threaten the "public peace, health or safety" or, rather, the financial expectations of the privileged few?

While the majority finds immediacy in the specifics of the Seahawks option, it elsewhere defends against the claim of unconstitutional special legislation by asserting that this legislation "applies to a class" of counties and "team affiliate[s]," not just the Seahawks only. Majority at 61. But if such is the case, how can we credit an "emergency" to the class by exclusively relying on the specific facts fortuitously unique to but one of its members?

Beyond that I wonder—if, indeed, the legislature acted with courage to avert a pending catastrophe at the last possible moment—what was the exact nature of the catastrophe so nearly avoided? In *CLEAN*-I it was the specter that the Mariners might leave town to make more money elsewhere which prompted the crisis which was "solved" through public financing of a new stadium.[11] However here the fate of that indispensable institution for public peace, health, or safety—the Seahawks—is not similarly secured by this legislative action but rather its future is simply referred to the whims of the electorate, with a declaration that the very legislators enacting this "emergency" measure may not even vote for new stadium taxes in any event.

How the act of simply holding an election without regard to result can qualify under the plain language of the constitutional imperative ("immediate preservation of the

---

[11]Although less than "an emergency of apocalyptic dimensions," the *CLEAN*-I majority advised. *Id.* at 809.

public peace, health or safety . . . .") is something which the majority does not explain and I cannot fathom. If the prospective loss of the Seahawks is an "emergency" which must be promptly "solved" by the legislature, an election would not necessarily approve the new taxes. At most an election is a means, not an end in itself.

I would prefer the good sense of schoolchildren who, if asked, "Is an election to consider public funding of a new football stadium 'necessary for the immediate preservation of the public peace, health or safety?' ", undoubtedly would answer "no," to the circumlocutions of the majority.

## UNCONSTITUTIONAL SPECIAL LEGISLATION

The second major flaw in the majority opinion is its treatment of the absolute constitutional prohibition against special legislation:

> The legislature is prohibited from enacting any private or special laws in the following cases:
>
> . . . .
>
> 6. For granting corporate powers or privileges.

CONST. art. II, § 28.

At the outset the majority finds an "emergency" in the need for an "expeditious vote" to precede the impending expiration date of Football Northwest's option to purchase the Seahawks team. Majority at 74. Yet the majority inconsistently justifies the legislation against the claim of special privilege to Football Northwest relying upon the statutory text's use of the generic term "team affiliate." Majority at 61. Although in some parallel universe "team affiliate" might reference something other than Football Northwest—not on this planet. But let us accept the challenge and test the claim of special privilege in the abstract.

Turning our attention to that provision of the statute which gives the "team affiliate" the exclusive right to pay for (or buy) the election, and thereby determine if we are to have one, one must also consider whether this provision

grants a special privilege to a corporation not available to others similarly situated.

As perceived by appellant in his brief, "[Const. art. II, § 28] is directed against legislation which favors one particular person, group or area to the exclusion of others" (citing *Municipality of Metro. Seattle v. City of Seattle*, 57 Wn.2d 446, 357 P.2d 863 (1960)), whereas "[s]ections of this provision tend to protect people of [the] state as a whole from legislative favoritism of individual or group" (citing *State ex rel. Collier v. Yelle*, 9 Wn.2d 317, 115 P.2d 373 (1941)). Br. of Appellant at 27-28.

It may be generally said that a special law is one which relates to particular persons or things while a general law is one which applies to all persons or things of a class. *Spokane & E. Trust Co. v. Hart*, 127 Wash. 541, 548, 221 P. 615 (1923) (citing *Young Men's Christian Ass'n v. Parish*, 89 Wash. 495, 154 P. 785 (1916)). However,

> "the true principle requires something more than a mere designation by such characteristics as will serve to classify, for the characteristics which thus serve as the basis of classification must be of such a nature as to mark the objects so designated as peculiarly requiring exclusive legislation. . . . The marks of distinction on which the classification is founded must be such, in the nature of things, as will, in some reasonable degree, at least, account for or justify the restriction of the legislation."

*Hart*, 127 Wash. at 548-49 (quoting *State ex rel. Richards v. Hammer*, 42 N.J.L. 435, 440 (1880), *aff'd*, 44 N.J.L. 667 (1882)). So even if we engage in the fiction that "team affiliate" is not merely a pseudonym for Football Northwest, but rather by pure coincidence a lonely star in an otherwise empty universe, the question still remains whether there is a rational basis to allow the "team affiliate" the exclusive privilege to hold the election by agreeing to pay for it, as this exclusive privilege is certainly unavailable to any other person or private corporation who might want to assure the election is conducted. But if an election, bought and paid for by a "team affiliate," is a good thing, why not make this a game anyone can play? The issue is exclusion.

In pertinent part this legislation specially delivers the right to conduct this election to uniquely privileged corporate hands:

> Notwithstanding any other provision of this act, this act shall be null and void in its entirety unless the team affiliate as defined in section 101 of this act enters into an agreement with the secretary of state to reimburse the state and the counties for the full cost of the special election to be held on or before June 20, 1997.

LAWS OF 1997, ch. 220, § 606.

What the majority fails to explain is why it is only the team affiliate which is favored with the unique option to buy this election. If this election is for a "public purpose," as says the majority, then why gamble the public interest by limiting the special power to hold it? Yes, I think by application of the criteria by which we measure special grants of corporate privilege, this is it. Even if we considered the "team affiliate" a "class" of corporations having but one member, it is still a special privilege to that class to the exclusion of those who are not in the class; whereas each excluded citizen has at least an equally rational basis to claim the right to pay for this election as does the privileged "team affiliate." *Compare CLEAN-I*, 130 Wn.2d at 802 ("In order to 'survive a challenge as special legislation, any exclusions from a statute's applicability, as well as the statute itself, must be rationally related to the purpose of the statute.'" (quoting *City of Seattle v. State*, 103 Wn.2d 663, 675, 694 P.2d 641 (1985)).

## CONCLUSION

As to what remains of our referendum clause, and the constitutional prohibition against special grants of corporate privilege, I see only an outline of ashes on the courtroom floor.